# Exhibit A

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| JESSICA ROBINSON, STACEY JENNINGS, and PRISCILLA MCGOWAN, individually and on behalf of others similarly situated,<br><br>Movants,<br><br>v.<br><br>BROOKE HOLDINGS DBA JACKSON HEWITT TAX SERVICE,<br><br>Respondent. | Case No. _____<br><br>**UNDERLYING LITIGATION**<br>Case No. 2:19-cv-09066-SDW-LDW (D.N.J.)<br><br>**DECLARATION OF BRADLEY K. KING IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO SUBPOENA** |

I, Bradley K. King, declare as follows:

1.     I am an attorney duly admitted to practice law in California, New Jersey, New York, and the District of Columbia. I am admitted to practice in the District of New Jersey and am counsel for Movants Jessica Robinson, Stacey Jennings, and Priscilla McGowan (collectively, "Movants") in *Robinson et al. v. Jackson Hewitt, Inc. et al.*, Case No. 2:19-cv-9066(SDW)(LDW) (D.N.J.) (the "Underlying Litigation"). I am a partner at Ahdoot & Wolfson, PC. I submit this declaration in support of Movants' Motion to Compel Production of Documents Pursuant to Subpoena (the "Motion"). The facts herein stated are true of my own personal knowledge, or I am informed and believe them to be true, and if called to

1

testify to such facts, I could and would do so competently.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the operative complaint in the Underlying Litigation.

3.      On November 30, 2020, Movants caused the Subpoena *duces tecum* to issue to Brooke Holdings DBA Jackson Hewitt Tax Service (the "Subpoena"). Attached hereto as **Exhibit B** is a true and correct copy of the Subpoena.

4.      On December 16, 2020, the Subpoena was served on Brooke Holdings. Attached hereto as **Exhibit C** is a true and correct copy of the proof of service of the Subpoena.

5.      On January 25, 2021, Joy Ramsingh, counsel for Brooke Holdings sent a letter to counsel for Movants seeking an extension to respond to the Subpoena to February 19, 2021, in which Ms. Ramsingh indicated, "My client has every intention of responding to this subpoena pursuant to the Stipulated Protective Order issued in this matter on January 4, 2021." Attached hereto as **Exhibit D** is a true and correct copy of the January 25, 2021, letter from Ms. Ramsingh.

6.      On January 27, 2021, I spoke telephonically with Ms. Ramsingh and agreed to an extension to February 15, 2021, for Brooke Holdings to respond to the Subpoena. During that telephone call, Ms. Ramsingh indicated to me that Brooke Holdings had no objections to the Subpoena in light of the Stipulated Protective Order entered in the underlying District of New Jersey action on January 4, 2021.

7.     On February 15, 2021, Brooke Holdings produced documents in response to the Subpoena electronically by sending them to the email address indicated by Movants on the Subpoena. Brooke Holdings did not include any formal written objections to the Subpoena and its attached requests for production of documents, nor in an accompanying letter from Ms. Ramsingh. Attached hereto as **Exhibit E** is a true and correct copy of the February 15, 2021, letter from Ms. Ramsingh.

8.     The documents produced by Brooke Holdings contained personally sensitive information and were designated Confidential under the operative Discovery Confidentiality Order in the Underlying Litigation. *Robinson v. Jackson Hewitt, Inc.*, Case No. 19-cv-09066 (D.N.J. Jan. 4, 2021) ECF No. 86 (Discovery Confidentiality Order). Attached hereto as **Exhibit F** is a copy of the Discovery Confidentiality Order.

9.     After Movants had an opportunity to review the documents produced by Brooke Holdings, I emailed Ms. Ramsingh on April 20, 2021, to indicate that the production was significantly deficient. In particular, I indicated that the production appeared to only be a data sample for six employees from a single franchise location, not a complete production of all responsive data for Brooke Holdings' 28 franchise locations. I further also indicated that, within that small sample, certain employee data also needed supplementing to be fully responsive to the Subpoena's requests.

10.    On April 26, 2021, Ms. Ramsingh responded to my email, indicating that, because the Subpoena was served on Brooke Holdings' Fort Valley, Georgia location, that Brooke Holdings "interpreted this subpoena as seeking information [only] from the Fort Valley location." Attached hereto as **Exhibit G** is a true and correct copy of the April 26, 2021, email from Ms. Ramsingh. In a separate email the following day, Ms. Ramsingh indicated that Brooke Holdings would produce the additional data requested (although, again, only for the Fort Valley location), which she did via a spreadsheet in another email dated April 30, 2021.

11.    On June 3, 2021, I emailed Ms. Ramsingh to request a full production of the requested data from all of Brooke Holdings' franchise locations.

12.    On June 4, 2021, Ms. Ramsingh responded and appeared to reiterate Brooke Holdings' position that only the Fort Valley location—not the other 27 Brooke Holdings locations—was subject to the Subpoena. Attached hereto as **Exhibit H** is a true and correct copy of the June 4, 2021, email from Ms. Ramsingh. That same day, I responded to Ms. Ramsingh's email by attaching the Subpoena and explaining that the Subpoena clearly seeks responsive documents from all of Brooke Holdings' franchise locations, not just the Fort Valley location where it was served.

13.    Ms. Ramsingh did not respond to my June 4, 2021, email and has not responded since, despite my two follow up emails on July 30, 2021 and August 5, 2021, in which I indicated that Movants would be bringing the instant Motion if

Brooke Holdings continued to fail to comply with the subpoena and complete the requested document production.

14.     As of the date of this filing, Ms. Ramsingh has not responded to my follow-up requests.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of August, 2021.

_____

Bradley K. King

# Exhibit A

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 877-3820
bgreenberg@litedepalma.com

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
| --- | --- |
| JESSICA ROBINSON, STACEY JENNINGS, and PRISCILLA MCGOWAN, individually and on behalf of others similarly situated, | Civil Action No.: 2:19-cv-9066 (SDW)(ESK) |
| *Plaintiffs*, | **THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC., | |
| *Defendants*. | |

# TABLE OF CONTENTS

**Page(s)**

I.  SUMMARY OF THE ACTION ................................................................... 1

II.  JURISDICTION AND VENUE ................................................................. 5

III.  THE PARTIES ........................................................................................ 7

IV.  FACTUAL ALLEGATIONS ..................................................................... 9

    A.  Trade and Commerce .................................................................... 9

    B.  The Jackson Hewitt Franchise........................................................ 9

        a.  Jackson Hewitt's Franchise Model Makes All
            Franchisees Independent Contractors Who Compete with
            Jackson Hewitt and with Each Other ........................................ 12

        b.  Jackson Hewitt's Independent Franchisees Exercise Sole
            and Complete Decision-Making Authority as to All
            Employment-Related Decisions of Jackson Hewitt
            Franchise Offices ................................................................... 14

    C.  The No-Poach Agreements Between and Among Competing
        Jackson Hewitt Locations Owned by Defendants and by
        Franchisees ................................................................................. 15

    D.  Employee Recruitment, Hiring, and Training.................................. 19

        a.  Jackson Hewitt Employee Training and Requirements........... 21

        b.  The Jackson Hewitt System ...................................................... 23

    E.  The Purpose and Effect of the Conspiracy was to Restrict
        Mobility and Suppress Compensation for Jackson Hewitt Tax
        Professionals............................................................................... 24

        a.  Restricted and Reduced Mobility ........................................... 24

        b.  Suppressed Compensation ....................................................... 25

    F.  Illegality and Anticompetitive Harm of Franchise No-Poach
        Agreements................................................................................. 26

V.  CO-CONSPIRATORS AND AGENTS..................................................... 27

VI.  CLASS ACTION ALLEGATIONS.......................................................... 28

VII.  ANTICOMPETITIVE EFFECTS AND LACK OF
     PROCOMPETITIVE JUSTIFICATION ..................................................... 30

i

835281.2

VIII.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS ...................32

IX.    CLAIM FOR RELIEF ...................................................................................33

X.     DEMAND FOR JURY TRIAL......................................................................35

XI.    PRAYER FOR RELIEF................................................................................36

835281.2

Plaintiffs Jessica Robinson, Stacey Jennings, and Priscilla McGowan bring this case under United States antitrust laws on behalf of themselves and all others similarly situated (the "Class," defined below) against Defendants Jackson Hewitt, Inc., and Tax Services of America, Inc. (collectively, "Jackson Hewitt" or "Defendants") based on Defendants' conspiracy between and among themselves and unnamed co-conspirators to suppress employee compensation, including that of Plaintiffs and the Class. All allegations are upon information and belief based upon the investigation of counsel, other than those concerning Plaintiffs personally. Plaintiffs bring this action to recover damages, including treble damages and other appropriate relief, and further allege as follows:

## I.     SUMMARY OF THE ACTION

1.      This is an antitrust Class action brought by and on behalf of individuals who work or have worked for Jackson Hewitt, a tax preparation services provider and franchisor, and for franchise locations of Jackson Hewitt.

2.      Jackson Hewitt is the second largest consumer tax services provider in the United States and provides tax preparation and assistance services at physical offices, online, and via desktop and mobile applications. Jackson Hewitt provides in-person tax preparation services at nearly 6,000 offices in the United States. Of those offices, approximately 3,900 are franchise locations and 1,800 are

1

corporate-owned. Under Jackson Hewitt's franchise model, franchisees compete with each other and with company-owned locations.

3.     Personnel in any labor market, including in the tax preparation labor market, benefit when employers compete for their services. Competition in the labor market creates negotiating leverage for personnel, which in turn leads to higher wages and greater mobility.

4.     Beginning at least by September 1, 2011, and continuing at least until December 20, 2018, the exact dates currently unknown to Plaintiffs, Defendants, along with other unnamed persons and entities acting as co-conspirators, engaged in a conspiracy to not compete for employees and potential employees, including, but not limited to, agreements not to solicit, recruit, or hire without prior approval each other's personnel (the "No-Poach/No-Hire Conspiracy" or "Conspiracy"). Defendants formed, entered into, carried out, and enforced the anti-competitive contract, combination, or conspiracy described herein.

5.     Defendants orchestrated, dispersed, and enforced the agreement among themselves and all franchisees, including at least in part through an explicit contractual prohibition ("No-Poach Clause") and a penalty provision for violations of the No-Poach Clause ("No-Poach Penalty") contained in standard Jackson Hewitt franchise agreements.

2

6.      The Conspiracy, and the anticompetitive agreements between and among Defendants and co-conspirators in furtherance thereof, are and were naked restraints of trade that constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Conspiracy, and the agreements and conduct by Defendants and co-conspirators in furtherance thereof, had the purpose and effect of unlawfully limiting Plaintiffs' and Class members' job mobility and suppressing their compensation below the levels that would have been available absent the Conspiracy.

7.      Under a "quick look" analysis, one with even a rudimentary understanding of economics could conclude that the arrangements and agreements between and among Defendants and their co-conspirators alleged herein would have an anticompetitive effect on Class members and markets.

8.      Under a rule of reason analysis, Defendants and unnamed co-conspirators exploited their collective market power in the relevant market, which is the labor market for employees and potential employees of Jackson Hewitt and its franchises, as defined herein, in the United States. The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects. In the alternative, even if the Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof have or had

procompetitive effects, any such procompetitive effects are and were substantially outweighed by the anticompetitive harm caused by the Conspiracy and Defendants' and others' conduct in furtherance thereof as alleged herein.

9.     The standard Jackson Hewitt franchise agreement in effect during the Class Period included a "Covenant Against Recruiting or Hiring Our Employees" clause, which stated:

> During the Term and for a period of two (2) years [afterward]… neither you nor any of your Owners may, without our prior written permission … solicit, recruit, or hire….any of our or our Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing, software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

10.     During the Class Period, Jackson Hewitt's standard franchise agreement also contained a provision that punished and discouraged violations of the No-Poach Clause by imposing a severe monetary penalty, equal to 300% of the annual salary of the employee recruited or hired in violation of the No-Poach Clause.

11.     The Conspiracy involves, at a minimum, Jackson Hewitt as well as its franchisees. Not only did Jackson Hewitt and its franchisees expressly agree for franchisees to not solicit or recruit employees from either other franchisees or from

Jackson Hewitt's company-owned stores, Jackson Hewitt itself adhered to the same agreement in the operation of its company-owned stores.

12.     The purpose and effect of the restraint was to limit and suppress mobility and compensation for all Class members, regardless of whether they tried to be recruited or hired by another Jackson Hewitt corporate or franchise location.

13.     These agreements impeded or restricted the movement of employees between Jackson Hewitt and its franchisees. These agreements also prohibited and prevented competition for employees between and among the members of the Conspiracy, including Jackson Hewitt and its franchisees. The agreements unreasonably limited franchisees' ability to solicit employees who work for Jackson Hewitt or other franchisees, reducing the pool of experienced candidates available to them, and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages.

## II.     JURISDICTION AND VENUE

14.     Plaintiffs bring this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

16.     As alleged in detail herein, including in Section IV(B), venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transact business in this District.

17.     In particular, all Jackson Hewitt Defendants are headquartered in the District of New Jersey and maintain their principal place of business in the District of New Jersey.

18.     Defendants are also subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of New Jersey. Each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

835281.2

### III.    THE PARTIES

19.     Plaintiff Jessica Robinson is an individual residing in Rockland, Maine. Plaintiff Robinson worked as a seasonal Tax Preparer primarily at Jackson Hewitt's Rockland, Maine location from 2017 through 2018. As a result of the conspiracy, Ms. Robinson's compensation and mobility were suppressed.

20.     Plaintiff Stacey Jennings is an individual residing in Paramount, California. During the Class Period, Plaintiff Jennings worked as a seasonal Tax Preparer for a Jackson Hewitt franchise located at the Walmart Supercenter at Long Beach Towne Center in Long Beach, California, from 2016 to 2017. As a result of the conspiracy, Ms. Jennings's compensation and mobility were suppressed.

21.     Plaintiff Priscilla McGowan is an individual residing in Memphis, Tennessee. During the Class Period, Plaintiff McGowan worked as a seasonal Tax Preparer for a Jackson Hewitt corporate location located in Memphis, Tennessee from 2017 to 2020. As a result of the conspiracy, Ms. McGowan's compensation and mobility were suppressed.

22.     Defendant Jackson Hewitt, Inc. ("JHI") is a Virginia corporation with headquarters at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302. JHI is the operating company within the Jackson Hewitt enterprise and is wholly-owned by Jackson Hewitt Tax Services, Inc. Among other things, it performs the

835281.2

enterprise's core business and administrative functions. It directly participated in the unlawful anticompetitive conspiracy at issue here, including by implementing the nationwide franchise model and entering into express written agreements that evidence and exemplify the anticompetitive conduct Plaintiffs challenge herein.

23.     Defendant Tax Services of America, Inc. ("TSA") is a Delaware corporation headquartered at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302. TSA is a wholly-owned subsidiary of JHI. In 1999, Jackson Hewitt formed TSA by contributing a majority of its company-owned locations to TSA. During the Class Period, TSA directly operated Jackson Hewitt's company-owned locations nationwide, which currently make up approximately 20% of all Jackson Hewitt locations. TSA directly participated in the unlawful anticompetitive conspiracy alleged herein, including by carrying out its terms and committing other overt acts in furtherance of the Conspiracy. JHI derives substantial income from the operations of TSA.

24.     Defendant Jackson Hewitt, Inc., and Defendant Tax Services of America, Inc. together are referred to herein as Jackson Hewitt.

25.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit and the identities of which are presently unknown, including Jackson Hewitt franchisees, as well as direct and indirect subsidiaries of Defendant Jackson Hewitt, Inc. that operate company-

8

owned stores, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the Conspiracy, or in furtherance of the anticompetitive conduct. Plaintiffs reserve the right to name some or all of these persons and entities at a later date.

26.     Whenever this Complaint references any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV.    FACTUAL ALLEGATIONS

### A.    Trade and Commerce

27.     Throughout the Class Period, Jackson Hewitt and co-conspirators employed Class members throughout the United States, including in this District.

28.     Jackson Hewitt's conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

### B.    The Jackson Hewitt Franchise

29.     Doing business as Jackson Hewitt, Defendants collectively provide tax preparation services to Americans seeking to file their income taxes with the

9

federal government and their respective state governments. Throughout a network of approximately 6,000 locations nationwide, Jackson Hewitt is the second largest full-service tax preparation business in the United States with franchised and company-owned office locations throughout the country. Jackson Hewitt Tax Services, Inc. and Jackson Hewitt, Inc. operates through a tightly controlled system of franchisees.

30.     Jackson Hewitt was founded in 1982 by John Hewitt, a former Regional Manager of H&R Block, who started working for H&R Block in 1969. Hewitt, along with a group of investors, purchased the six-location Mel Jackson's Tax Service of Norfolk, Virginia in 1982 and renamed it Jackson Hewitt.

31.     Jackson Hewitt began selling franchises in 1986 and rapidly expanded throughout the United States through its franchise program. Jackson Hewitt began contracting with the Montgomery Ward department store chain in 1989 to open offices in 169 of its store locations. By 1992, Jackson Hewitt became the second-largest tax preparation chain, behind H&R Block. Since then, Jackson Hewitt has opened locations in national retail chains including Wal-Mart, Sam's Club, Kmart, and Sears.

32.     In 1999, Jackson Hewitt formed TSA to own and operate a majority of its company-owned locations. Of Jackson Hewitt's franchisees, TSA is the largest, directly operating approximately 20% of the locations operating under the

10

name "Jackson Hewitt," while the rest of the locations are run by non-owned franchisees.

33.     By no later than 2000, Jackson Hewitt's standard franchise agreement, entered into between Jackson Hewitt and each and every franchisee nationwide, contained the No-Poach Clause, an express provision restricting the soliciting, recruiting, and hiring of certain employees by and between franchisees and company-owned locations.

34.     Jackson Hewitt filed for Chapter 11 bankruptcy on May 24, 2011. The United States Bankruptcy Court for the District of Delaware approved Jackson Hewitt's Amended Joint Prepackaged Plan of Reorganization on August 9, 2011.

35.     During the Class Period, Jackson Hewitt's standard franchise agreement, entered into between Jackson Hewitt and each and every franchisee nationwide, also contained the No-Poach Penalty, an express provision that punishes and discourages violations of the No-Poach Clause by assessing a heavy monetary penalty for each violation of the No-Poach Clause.

36.     As stated in its 2018 Franchise Disclosure Document ("FDD"), Jackson Hewitt's total revenues for fiscal year 2018 were about $244.5 million.

37.     At its peak, Jackson Hewitt had over 7,400 company-owned and franchise locations that prepared more than 3.4 million tax returns in a single tax season.

835281.2

38.     Today, Jackson Hewitt has nearly 6,000 office locations in the United States, with approximately 1,900 corporate-owned offices and 3,800 franchise offices. About half of all Jackson Hewitt offices are located inside Wal-Mart stores. There are both corporate-owned and franchise locations in virtually every state and the District of Columbia. Jackson Hewitt is, and has been throughout the Class period, the second-largest tax preparation firm in the United States.

39.     Jackson Hewitt's major revenue sources include tax preparation fees and related services performed at corporate-owned tax offices, franchise royalties, sales of desktop tax preparation software, and fees from related services and products.

40.     Jackson Hewitt holds itself out as an, "industry leading provider of full-service individual, federal, and state income tax preparation with offices all across the country." https://www.jacksonhewitt.com/careers/ (last visited Dec. 14, 2018).

41.     Jackson Hewitt states on its public website that it employs "over 25,000 Tax Pros who know taxes and tax reform inside and out." https://www.jacksonhewitt.com/ (last visited Dec. 14, 2018).

a. **Jackson Hewitt's Franchise Model Makes All Franchisees Independent Contractors Who Compete with Jackson Hewitt and with Each Other**

42.     Jackson Hewitt franchisees throughout the United States operate on standardized terms pursuant to a common franchise license agreement. They are competitors with Jackson Hewitt and with each other.

43.     Jackson Hewitt franchise offices operate as independent companies and separate economic entities from Jackson Hewitt.

44.     Jackson Hewitt franchisees are independent contractors. Such franchisees independently own and operate their businesses. As stated in Jackson Hewitt's standard franchise agreement, Jackson Hewitt franchisees function in an "independent contractor" relationship with Jackson Hewitt Defendants.

45.     Jackson Hewitt makes clear in its standard franchise agreement to Jackson Hewitt franchisees, "[y]ou acknowledge that you are an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists between you and us." In fact, the standard franchise agreement specifically requires that franchisees hold themselves out as "independently owned and operated."

46.     Jackson Hewitt further makes clear in its standard franchise agreement to Jackson Hewitt franchisees that, "[y]ou are not authorized to make any contract, warranty or representation, or incur any obligation on our behalf,"

13

and that "[t]his Agreement is solely a license to use our Marks in a tax return preparation business using our Operating System."

47.     Moreover, Jackson Hewitt's standard franchise agreement states that its franchisees compete with each other and with Jackson Hewitt's company-owned locations. The franchise agreement expressly notifies franchisees that, "you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

**b.     Jackson Hewitt's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of Jackson Hewitt Franchise Offices**

48.      Jackson Hewitt on the one hand, and the franchisees on the other, purport to make separate and independent decisions.

49.     Jackson Hewitt's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of Jackson Hewitt:

> Since you are an independent contractor, you have the sole right to control all aspects of your relationships with your employees and prospective employees, including all decisions regarding hiring, firing, training, supervision, discipline, scheduling (including if you use any scheduling modules we provide to you ) and compensation (paying wages and withholding and paying taxes) in respect of your employees…Neither you, nor your manager or your employees shall be considered or represented as our employees or agents.

14

50.     Thus, as Jackson Hewitt's standard franchise agreement and FDD makes clear, Jackson Hewitt franchise locations are intended to compete, and do compete, with each other as well as with Jackson Hewitt corporate-owned locations. Each franchisee independently owns and operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment-related decisions, including, but not limited to, recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline, and other day-to-day management of employees.

51.     But for the conspiracy, and the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof, each Jackson Hewitt franchisee would have been free to make its own market decisions relating to recruitment, hiring, firing, advancement, promotion, staffing, wages, conditions of employment, discipline, and other day-to-day management of employees throughout the Class Period. But for the conspiracy, and the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof, Jackson Hewitt franchisees would have competed with other Jackson Hewitt franchisees and with Jackson Hewitt itself for employees, and would have solicited, recruited, and hired employees from other Jackson Hewitt franchisees and from Jackson Hewitt corporate-owned locations throughout the Class Period.

15

**C.    The No-Poach Agreements Between and Among Competing Jackson Hewitt Locations Owned by Defendants and by Franchisees**

52.    Notwithstanding the provisions of the standard franchise agreement, including its definition of the franchisor-franchisee relationship as a competitive one, Jackson Hewitt and its franchisees have agreed not to compete with respect to recruiting, soliciting, and hiring of employees.

53.    Beginning at least by September 1, 2011, and continuing through at least December 20, 2018, Jackson Hewitt, along with unnamed co-conspirators, carried out a scheme related to the solicitation, recruitment, and hiring of employees and potential employees, which included policies and agreements not to solicit, recruit, or hire each other's personnel without prior approval.

54.    As alleged herein, the Conspiracy, including the anticompetitive No-Poach agreements, were between and among separate economic actors pursuing separate economic interests such that the agreements deprive the marketplace generally and the Class members in particular of the benefits of independent centers of decision making as well as the benefits of free and open competition.

55.    In relation to and in furtherance of the Conspiracy, Jackson Hewitt and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and Jackson Hewitt's corporate-owned tax offices. In particular, the standard language in Jackson Hewitt's franchise agreements with all franchisees who executed franchise agreements

16

during the Class Period includes an express No-Poach Clause that prohibits

franchisees from soliciting, recruiting, or hiring employees of their competitors –

other Jackson Hewitt franchisees and Jackson Hewitt and its affiliates.

56.     The standard franchise agreement between Jackson Hewitt and its

franchisees during the Class Period included a clause entitled "Covenant Against

Recruiting or Hiring Our Employees" that states:

> During the Term and for a period of two (2) years [afterward]…
> neither you nor any of your Owners may, without our prior written
> permission … solicit, recruit, or hire….any of our or our Affiliates'
> employees whose duties with us or our Affiliates include(d)
> management of or over company-owned or franchised stores,
> franchisee training, tax preparation software writing or debugging, tax
> return processing, software writing or debugging, electronic filing of
> tax returns, tax return processing, processing support, tax return
> preparation, or tax return preparation advice or support.

57.     This prohibition against soliciting, recruiting, or hiring such

employees remains in effect for one year after the termination of their employment

with Jackson Hewitt or its affiliates.

58.     Moreover, beginning no later than 2015 and continuing through at

least July 2018, the standard franchise agreement included a "Recruiting Fee" in

connection with the No-Poach Clause. As described in the FDD, the fee was

"300% of the annual salary of person recruited or hired." In "plain English," this

fee applies:

> if you recruit or hire any person then employed, or who was employed
> within the immediately preceding 24 months by us, any of our

17

Affiliates, or a Jackson Hewitt franchise owner, or any of our or our
Affiliates' officers or directors.

59.     Duane Mora, Jackson Hewitt's Senior Vice President of Franchise
Operations, admitted that Jackson Hewitt's No-Poach Penalty was intended to act
as a "disincentive for new franchisees" to violate Jackson Hewitt's No-Poach
Clause in order to "protect existing franchisees from having their best tax preparers
hired away from them." Julie Bennett, *Switches at top for Jackson Hewitt*, May 23,
2017, available at https://www.franchisetimes.com/June-July-2017/Switches-at-
top-for-Jackson-Hewitt/.

60.     Accordingly, Jackson Hewitt has acknowledged that the No-Poach
Clause and the No-Poach Penalty were in furtherance of the Conspiracy, which
purpose and effect was to reduce and/or eliminate competition for employees
between and among Jackson Hewitt Defendants and their co-conspirators and to
suppress employee compensation.

61.     The No-Poach agreements, including the No-Poach Clause and the
No-Poach Penalty, were not intended or limited to simply protecting Jackson
Hewitt's investment in training its employees at corporate-owned offices. After all,
the franchise offices' employees were required to meet the same training
requirements.

62.     The restriction placed on franchisees from poaching **employees from
other franchisees** further underscores the true purpose and value of the No-Poach

Clause, the No-Poach Penalty, and surrounding policies to Jackson Hewitt:
restricting competition for employees in the market and artificially suppressing
wages among competing firms in a highly specialized sector.

63.     While the No-Poach Clause and the No-Poach Penalty in the standard
franchise license agreement ostensibly placed an obligation only upon franchisees,
Jackson Hewitt operated under the same policy to effectuate and enforce the
Conspiracy. The purpose and effect of this provision is to enforce and perpetuate
the Conspiracy, in particular, by identifying, preventing, discouraging, and
punishing violations of the anticompetitive agreements.

**D.      Employee Recruitment, Hiring, and Training**

64.     As the second largest provider of tax preparation services in the
United States, Jackson Hewitt needs workers trained not only in tax preparation
and assistance but also in Jackson Hewitt's System. The same is true for Jackson
Hewitt franchisees.

65.     At the height of the 2018 tax season, Jackson Hewitt's corporate and
franchise owned locations employed over 25,000 individuals, including tax
professionals, most of whom were seasonal.

66.     Due to the seasonal nature of tax preparation and related services,
Jackson Hewitt and its franchisees recruit and hire a large number of new or
returning employees every year. As Jackson Hewitt highlights in its 2010 Form 10-

835281.2

K disclosure to the Securities and Exchange Commission, "[w]e generate substantially all our revenues during the period from January 1 through April 30," which "presents a number of operational challenges for us and our franchisees" such as the ability to maintain "flexible staffing" to meet its seasonal staffing needs "because the number of employees at our network's offices during the peak of the tax season is exponentially higher than at any other time[.]"

67.    Jackson Hewitt's 10-K further underscores the importance of recruiting and hiring large numbers of qualified tax preparers each tax season in disclosing that, if "we were to experience significant business interruptions during the tax season, which may be caused by labor shortages" or other significant events, "we could experience a loss of business, which could have a material adverse effect on our business, financial condition and results of operations."

68.    Moreover, Jackson Hewitt states that its "[a]ctual results may differ materially from those contemplated (expressed or implied) by [its] forward-looking statements" in its 10-K due to "potential risks and uncertainties" such as "our ability to successfully attract and retain key personnel," and that "[c]ompetition for executive, managerial and skilled personnel in our industry remains intense."

69.    As Jackson Hewitt recognized in its Form 10-K filing, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between Jackson Hewitt, its franchise locations, and other

companies providing tax preparation services, and thus, higher wages, benefits, compensation, and other terms of employment. Instead, as part of its efforts to avoid "significant business interruptions during the tax season, which may be caused by labor shortages," in a labor market with "intense" competition, Jackson Hewitt conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation, and other terms of employment.

### a. Jackson Hewitt Employee Training and Requirements

70. To qualify for employment at Jackson Hewitt or its franchisees, each tax professional, as defined herein, must complete the entry level tax course, the Jackson Hewitt Basic Tax Preparation Course, or demonstrate equivalent knowledge by passing an internal exam.

71. Jackson Hewitt's Basic Tax Preparation Course takes approximately 70 hours to complete.

72. Upon completion, tax professionals obtain a Jackson Hewitt Certification. This Certification is a prerequisite for most, if not all, tax preparation jobs at Jackson Hewitt corporate or franchise locations.

73. Jackson Hewitt and its franchisees require tax professionals to pass their internal exam every year.

835281.2

74.     While Jackson Hewitt's Basic Tax Preparation Course covers general basic tax preparation skills, enrollees spend significant time learning skills specific to employment at Jackson Hewitt and its franchisees. For example, tax professionals at Jackson Hewitt must master working with ProFiler, Jackson Hewitt's proprietary interview-based tax preparation software. Because ProFiler is interview-based, it is designed and intended to be used by tax professionals servicing clients rather than by an individual preparing his/her own tax returns. And, because ProFiler is proprietary, it can be used only by Jackson Hewitt tax professionals. Thus, the knowledge and skills associated with use of ProFiler is specific to employment as a tax professional at Jackson Hewitt.

75.     Tax professionals may further enroll in Intermediate and Advanced Tax Courses at Jackson Hewitt.

76.     Jackson Hewitt's website makes clear that completion of Jackson Hewitt's 70-hour Basic Tax Preparation Course "is neither an offer nor a guarantee of employment" at Jackson Hewitt or its franchisees, and "[a]dditional training, experience or skills may be required" for employment at Jackson Hewitt or its franchisees.

77.     Jackson Hewitt and its franchisees do not require tax professionals to have obtained degrees or general education levels. Rather, tax professionals must possess familiarity with Jackson Hewitt's products, services, and selling techniques

and be able to "[p]resent[] the Company's value proposition to clients concerning various company products and services and use[] prescribed selling techniques."

78. These Jackson Hewitt tax courses and certifications, as well as familiarity with Jackson Hewitt's products, services, and selling techniques, are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

79. With limited educational qualifications apart from dozens of hours invested in Jackson Hewitt-courses and familiarity with Jackson Hewitt's products, services, and selling techniques, many tax professionals at Jackson Hewitt's corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations. Thus, employees should generally be highly mobile between and among Jackson Hewitt's corporate-owned and franchise offices.

80. In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for Jackson Hewitt-trained workers in the highly specialized and technical tax preparation services industry, particularly within the Jackson Hewitt System, would be robust and would have increased and enhanced the workers' compensation and mobility.

### b. The Jackson Hewitt System

81.     In addition to the Jackson Hewitt courses, certifications, products, services, and selling techniques discussed above, all tax professionals at Jackson Hewitt and its franchisees must gain familiarity with Jackson Hewitt's proprietary Operating System.

82.     Each Jackson Hewitt corporate and franchise location must operate in accordance with Jackson Hewitt's "plan and system for preparing, checking and electronically filing income tax returns using our software, accounting methods, merchandising, equipment selection, advertising, promotional techniques, personnel training and quality standards that feature the Marks (the 'Operating System')." The Jackson Hewitt Operating System includes the Jackson Hewitt Operating Standards, Marks Standards, and Technology Standards.

83.     A Jackson Hewitt affiliate, Jackson Hewitt Technology Services LLC, provides various technology services specifically for the Jackson Hewitt Operating System.

84.     As a result of completing Jackson Hewitt tax courses, certifications, and internal exams, and acquiring specialized knowledge as to the Jackson Hewitt proprietary Operating System, including Operating Standards, Marks Standards, and Technology Standards, as well as Jackson Hewitt's proprietary ProFiler tax return preparation software, employment with a non-Jackson Hewitt tax

24

preparation company or business is not a reasonable substitute for the employees of Jackson Hewitt and its franchisees.

**E. The Purpose and Effect of the Conspiracy was to Restrict Mobility and Suppress Compensation for Jackson Hewitt Tax Professionals**

**a. Restricted and Reduced Mobility**

85. Defendants' Conspiracy has restricted and reduced mobility between Jackson Hewitt corporate-owned and franchise locations.

86. The Conspiracy restricted employees' mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation, and other benefits, compounded over the long term of the Conspiracy.

87. The Conspiracy and its harmful effects were not limited to tax professionals but extended to managers, executives, and other employees of Defendants.

**b. Suppressed Compensation**

88. Jackson Hewitt and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees of Jackson Hewitt and its franchisees are paid below the national salary for similar job titles.

89. For example, Jackson Hewitt Senior Tax Preparers have an average base pay of approximately $11.00 per hour, which annualizes to a yearly salary of

25

$22,963, while the national mean annual salary for a senior tax preparer is $76,795.

Jackson Hewitt Tax Preparers reportedly earn approximately $10.90 per hour,

which annualizes to $22,714, while the national mean annual salary for tax

preparers is $28,205.

90.     Figure 1 below shows approximate average earnings at Jackson

Hewitt compared to national figures for comparable positions.

**Figure 1**

### Jackson Hewitt Average Salary v. National Average Salary
### Tax Employees

| Job Title | Jackson Hewitt | | National Average Salary | Percentage Below National Average |
| | Hourly Wage | Annual Salary | | |
| | | (2)*2080 | | ((4)-(3))/(4) |
| (1) | (2) | (3) | (4) | (5) |
| 1. Certified Public Accountant | $  15.0 | $  31,200 | $  84,235 | 63% |
| 2. Senior Tax Preparer | 11.0 | 22,963 | 76,795 | 70% |
| 3. Tax Manager | 16.6 | 34,507 | 107,018 | 68% |
| 4. Tax Preparer | 10.9 | 22,714 | 28,205 | 19% |

91.     But for the Conspiracy, employee compensation at Jackson Hewitt

corporate-owned and franchise offices would be significantly higher.

**F.     Illegality and Anticompetitive Harm of Franchise No-Poach Agreements**

92.     On or about July 9, 2018, the Attorneys General of ten states and of

the District of Columbia announced an investigation into the anticompetitive hiring

and recruiting practices and procedures used by several large franchise companies,

and stated that:

835281.2

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

93.     On or around December 20, 2018, Jackson Hewitt entered into an Assurance of Discontinuance with the State of Washington through its Attorney General. In particular, Defendant Jackson Hewitt, Inc. agreed, among other things, to remove the No-Poach Clause from its franchise agreement going forward and to cease enforcement of the No-Poach Clause.

## V.     CO-CONSPIRATORS AND AGENTS

94.     The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

95.     Individuals and/or entities not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

96.     Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents.

97.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## VI.   CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All persons who worked at any Jackson Hewitt location in the United States, whether owned and operated by Jackson Hewitt or by its franchisee, at any time between September 1, 2011, and December 20, 2018.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

99.     Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants or co-conspirators

and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

100.    Plaintiffs do not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but, based upon the nature of trade and commerce involved, as well as the scope and duration of the Conspiracy, Plaintiffs believe that there are at least thousands of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

101.    The questions of law or fact common to the Class include, but are not limited to:

    a.    whether the Conspiracy violated the Sherman Act;

    b.    whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

    c.    whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

    d.    whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury; and

    e.    the type and measure of damages suffered by Plaintiffs and the Class.

835281.2

102.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

103.    Plaintiffs' claims are typical of the claims of the Class.

104.    Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

105.    Plaintiffs have retained competent counsel experienced in antitrust litigation, and specifically with respect to antitrust litigation involving agreements regarding hiring, recruiting, no-poach agreements, and Class action litigation to represent themselves and the Class.

106.    Defendants and the co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

107.    This Class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a Class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a Class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.   ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

108.   The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, retraining, and stabilizing the compensation paid to their personnel at artificially low levels.

109.   The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

110.   While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for employees and potential employees of Jackson Hewitt and its franchises, as defined herein, in the United States.

111.   Through their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefits, and other aspects of compensation and eliminate competition.

31

112.    The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

113.    In the alternative, any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are substantially outweighed by the anticompetitive harm alleged herein, including, but not limited to, restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

114.    Defendants are also liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on Class members and markets.

## VIII.  EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

115.    While Plaintiffs had knowledge of aspects of Defendants' industry recruiting practices, Plaintiffs had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, July 9, 2018. Nor did Plaintiffs have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiffs that their compensation was not competitive but was instead suppressed

by Defendants' anticompetitive agreements. Plaintiffs therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

116.    Plaintiffs and the Class have no reason to know of Defendants' unlawful conspiracy. Plaintiffs and the Class are not parties to the franchise agreements between Jackson Hewitt and its franchisees, nor are these contracts routinely provided to employees or prospective employees.

117.    Jackson Hewitt discloses its current FDD to certain state regulators as required. However, Jackson Hewitt only otherwise provides its FDD to legitimate potential franchisees. And, Jackson Hewitt does not provide historic FDDs to potential franchisees or employees.

118.    Conspiracies, by their nature, must be concealed. To keep the Conspiracy hidden from those it affected most—their employees and prospective employees—Defendants and their co-conspirators did not inform employees of the Conspiracy between Jackson Hewitt and its franchisees during the application process or the new employee onboarding process.

119.    Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

120.    As a result of Defendants' and their co-conspirators' successful efforts to conceal the facts and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiffs' claims concerning Defendants' conspiracy.

## IX.    CLAIM FOR RELIEF

**(Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3)**

121.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint, and further allege the following:

122.    Beginning no later than September 1, 2011, and continuing until at least December 20, 2018, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

123.    Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing, and stabilizing the wages, benefits and other aspects of compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for labor.

124.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the

Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

125.    The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

      a.  competition among Defendants and their franchisees for labor has been suppressed, restrained, and eliminated; and

      b.  Plaintiffs and Class members have received lower compensation from Defendants and franchisees than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

126.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

127.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

128.    Accordingly, Plaintiffs and Class members are entitled to three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a

permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## X.    DEMAND FOR JURY TRIAL

129.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the Class, demands a jury trial as to all issues triable by a jury.

## XI.    PRAYER FOR RELIEF

130.    WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

a.  This action may be maintained as a Class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

b.  Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiffs and the Class members have been damaged and injured in their business and property as a result of this violation;

c.  The alleged combinations and Conspiracy are *per se* violations of the Sherman Act;

d.  Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

36

    e.  Judgment be entered for Plaintiffs and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiffs and the Class, as allowed by law;

    f.  Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

    g.  Plaintiffs and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

    h.  Plaintiffs and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: July 17, 2020

Respectfully submitted,

**HARTLEY LLP**
Jason S. Hartley (*pro hac vice*)
101 West Broadway, Suite 820
San Diego, California 92101
(619) 400-5822
hartley@hartleyllp.com

**PAUL LLP**
Richard M. Paul III (*pro hac vice*)
Laura C. Fellows (*pro hac vice*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
Rick@PaulLLP.com
Laura@PaulLLP.com

*/s/ Bruce D. Greenberg*
**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 877-3820
bgreenberg@litedepalma.com

**JOSEPH SAVERI LAW FIRM, INC.**
Joseph R. Saveri (*pro hac vice*)
James G.B. Dallal (*pro hac vice* on file)
601 California Street, Suite 1000
San Francisco, California 94108
(415) 500-6800
jsaveri@saverilawfirm.com
jdallal@saverilawfirm.com

37

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (*pro hac vice*)
Amanda M. Williams (*pro hac vice* forthcoming)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongleuk.com

**FREED KANNER LONDON & MILLEN LLC**
Douglas A. Millen (*pro hac vice*)
Brian Hogan (*pro hac vice*)
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
(224) 632-4500
dmillen@fklmlaw.com
bhogan@fklmlaw.com

**ADHOOT & WOLFSON, PC**
Tina Wolfson (*pro hac vice* forthcoming)
10728 Lindbrook Drive
Los Angeles, California 90024
(310) 474-9111
twolfson@adhootwolfson.com

**ATTORNEYS FOR PLAINTIFFS**

835281.2

# Exhibit B

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | |
|---|---|
| JESSICA ROBINSON, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:19-cv-9066-SDW-ESK |
| | ) |
| JACKSON HEWITT, INC., et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Brooke Holdings dba Jackson Hewitt Tax Service, c/o Surujpaul Ramsingh EA, Principal, 401 Martin Luther King Drive, Fort Valley, GA 31030

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See Attachment A hereto

| Place: Athens Reporting/A Veritext Affiliate, 460 N. Thomas Street, Athens, GA 30601; production-ca@veritext.com | Date and Time: 01/02/2021 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/30/2020

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs
_____, who issues or requests this subpoena, are:

Bruce D. Greenberg, 570 Broad St., Ste. 1201, Newark, NJ 07102, bgreenberg@litedepalma.com, (973) 877-3820

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:19-cv-9066-SDW-ESK

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

      I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

      ❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

      ❏  I returned the subpoena unexecuted because: _____

_____ .

      Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

      $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

      I declare under penalty of perjury that this information is true.

Date: _____

                                                 _____
                                                        *Server's signature*

                                               _____
                                                     *Printed name and title*

                                             _____
                                                     *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSICA ROBINSON, STACEY JENNINGS, and PRISCILLA MCGOWAN, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC.,<br><br>*Defendants*. | Civil Action No.: 2:19-cv-9066 (SDW)(LDW) |

# ATTACHMENT A

## TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

## DEFINITIONS

1. As used herein, "JACKSON HEWITT" means the brand of tax preparation services marketed by Defendants JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC., as identified above, and includes any person or entity acting at their direction, or on their behalf, whether as a corporate-owned location or a franchise.

2. The term "NO-POACH AGREEMENT" means a verbal agreement, informal agreement, and/or a written contractual provision in a JACKSON HEWITT franchise agreement or elsewhere limiting or purporting to limit the hiring, recruitment, or solicitation of employees of JACKSON HEWITT or other JACKSON HEWITT franchisees.

3. The terms "DOCUMENT" or "DOCUMENTS" mean a writing, recording, and/or photograph, as defined in the Federal Rules of Evidence, and includes the original, or a copy, of handwriting, typewriting, printing, photostats, photographs, electronically stored information, email, electronic media and transmission (including pixels and internet), and every other means of recording upon any tangible thing, and form of communicating or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored. Without limiting the breadth and generality of the foregoing, DOCUMENT includes Electronically Stored Information ("ESI") and all information maintained as computer files, or otherwise, on computer

disks or any other computer storage media. "DOCUMENT" means and is defined synonymously with "WRITING."

4. "ESI" means electronically stored information that is stored in an electronic medium. All ESI, including email, word processing and spreadsheet documents, and other pertinent files shall be produced in their original, and native, format.

## REQUEST NO. 1:

Employment data for all individuals who worked at any of your JACKSON HEWITT locations from December 20, 2014 through the present, including the:

a. Name;

b. Unique employee identification number;

c. Compensation data/payroll information (e.g. wages per hour or salary);

d. Employer/store name, office number, and location (address);

e. Job title/position and/or employee classification (with related codes and descriptions);

f. Demographic information (e.g. social security number, home address, education level, age, and gender);

g. Employment dates (in each position if multiple held);

h. Number of hours logged per day, week, month, and/or year;

i. Records of promotions and corresponding pay increases/changes in benefits;

j. Full-time or part-time status;

k. Exempt or non-exempt status;

l. Employee status (e.g., active, terminated) status;

m. Leaves of absence;

m. Whether or not an employee non-competition agreement (or similar document) was signed;

n. Prior employment data; and

o. Such other regularly maintained personnel data as may be relevant to the claims and defenses in this case.

**REQUEST NO. 2:**

Documents sufficient to explain the meaning of the data responsive to any of these Requests (including all record layouts, data dictionaries, field codes, and other codes or descriptions) and to show how to operate or run any of the programs maintained on the computer-related equipment or systems utilized by you to maintain data responsive to any of these Requests, including whether any such data can be produced within an excel spreadsheet.

**REQUEST NO. 3**

Documents sufficient to show all individuals involved in, or having oversight or control over, the hiring, recruiting, retaining, or compensating of your employees that worked at a JACKSON HEWITT location, including organization charts, telephone or email directories, personnel bios, and individual job descriptions from December 20, 2014 through the present.

**REQUEST NO. 4**

Documents sufficient to show your compensation structure for any employees that worked at a JACKSON HEWITT location, among and within departments, divisions, groups, units and sub-units, from December 20, 2014 through the present, including:

    a.   pay bands, levels, grades or ranges for particular categories of employees;

    b.   compensation relationships among employees within the same employment category;

    c.   compensation relationship among employees across different employment categories; and

    d.   compensation relationships among employees across different locations.

**REQUEST NO. 5:**

Documents and data sufficient to show your bonus or commission structure for any employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present, including:

      e.  bonus pools and relevant groups and sub-groups of Employees eligible to share a bonus pool or receive commission;

      f.  form of bonuses, and whether bonuses consist of cash, equity, or both;

      g.  types of bonuses offered, including incentive, retention, and signing;

      h.  types of commissions offered and manner in which they were determined;

      i.  timing or frequency of bonuses and commissions; and

      j.  any changes to Your bonus or commission structures over time.

**REQUEST NO. 6:**

Documents and data sufficient to show your benefits policy for any employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present, including:

      a.  types of Benefits packages offered by position;

      b.  differences in Benefits packages across Employees; and

      c.  any changes to Your Benefits policy over time.

**REQUEST NO. 7:**

Documents and data sufficient to show all employment, personnel and HR databases you kept for each of your employees for any employees that worked in a JACKSON HEWITT location from December 20, 2014, through the present.

          Civil Action No.: 2:19-cv-9066

**REQUEST NO. 8:**

Documents and data sufficient to show all employment, personnel and HR databases you kept for each job application you received during the Relevant Period for employment or possible employment at any JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 9:**

Documents and data from your employment, personnel or HR databases identifying, for each prospective employee you recruited or attempted to recruit for any JACKSON HEWITT location from December 20, 2014 through the present:

    a.   recruit's name or other identifier;

    b.   date recruitment initiated;

    c.   position for which recruited;

    d.   source of recruitment, such as in-house recruiting or third-party recruiting service;

    e.   manner or method of recruitment, including but not limited to cold-calling, LinkedIn messaging, or other solicitation;

    f.   any resume or curriculum vitae received from recruit, sufficient to show current and former employment, including any experience working for another Jackson Hewitt corporate-owned location or Franchise; education; and any special skills possessed, along with any other materials requested or received;

    g.   any actions taken, including interviews or requests for additional information, and date of any actions taken;

    h.   any offer of employment extended to recruit and date of offer;

    i.   terms of any offer package extended to recruit, including salary or other

        benefits offered;

    j.   outcome of any offer extended, including date offer extended, accepted or

        rejected;

    k.   terms of any counteroffer received or offered, or negotiations undertaken

        regarding the offer and the outcome of such negotiations; and

    l.   any internal notes regarding recruit.

**REQUEST NO. 10:**

Documents sufficient to show how you categorize your employees of any JACKSON HEWITT location, including categorization by type, title, skill, job family, seniority, department, or compensation level from December 20, 2014 through the present.

**REQUEST NO. 11:**

Documents sufficient to show how you determine, update, monitor, or set baseline compensation levels, grades, bands, ranges, or similar parameters (as opposed to negotiated employment levels) of your employees of any JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 12:**

Documents describing the format, content, and use of your employment, personnel or HR databases, including any user manuals or guides, instruction manuals or guides, and terms of use.

**REQUEST NO. 13:**

Documents sufficient to show your policies, practices and procedures related to recruiting, hiring, terminating, or retaining employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 14:**

All Franchise disclosure Documents, including any registered or filed with any state or issued from December 20, 2014 through the present, and any communications regarding Franchise disclosure Documents.

**REQUEST NO. 15:**

All Franchise Agreements, including any registered or filed with any state or issued from December 20, 2014 through the present, and any communications regarding Franchise Agreements.

**REQUEST NO. 16:**

All documents, including communications, between you and any JACKSON HEWITT location, whether Franchise-owned or owned by Jackson Hewitt Inc. or Tax Services of America Inc., regarding soliciting, recruiting, or hiring an individual employed at any time by you or another JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 17:**

All documents, including communications, regarding the Recruiting Fee Development Agreement, if any, as described in the JACKSON HEWITT Franchise disclosure Documents from December 20, 2014 through the present.

**REQUEST NO. 18:**

All documents, including communications, regarding the JACKSON HEWITT Franchise

Agreement clause "Covenant Against Recruiting or Hiring Out Employees" from December 20,

2014 through the present.

**REQUEST NO. 19:**

All documents that analyze, evaluate, or summarize competition from December 20,

2014 through the present:

    a.  for JACKSON HEWITT customers between Franchises;

    b.  for JACKSON HEWITT customers between Franchises and Jackson Hewitt Inc. or

       Tax Services of America Inc.-owned locations;

    c.  for JACKSON HEWITT labor;

    d.  with other non-JACKSON HEWITT companies providing tax preparation services.

**REQUEST NO. 20:**

All documents, including communications, regarding agreements between you and

Jackson Hewitt Inc. or Tax Services of America, Inc. regarding your recruiting or hiring practices

for any JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 21:**

All documents, including communications, sufficient to show your policies, practices and

procedures related to how you determine the compensation of your employees that worked in a

JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 22:**

All documents, including communications, regarding any agreements between you and

Jackson Hewitt Inc. or Tax Services of America, Inc. regarding how you determine the

compensation of any employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 23:**

Documents sufficient to show the policies, practices and procedures related to your decision to extend an offer of employment in a JACKSON HEWITT location from December 20, 2014 through the present and how you determine the terms of such an offer of employment.

**REQUEST NO. 24:**

All documents, including communications, regarding agreements between you and any other JACKSON HEWITT location from December 20, 2014 through the present regarding decisions to extend an offer of employment by you or the other JACKSON HEWITT location and how you determine the terms of an offer of employment by you.

**REQUEST NO. 25:**

All documents regarding the method and manner in which you monitor compliance with your practices, policies and procedures with respect to soliciting, recruiting, hiring, terminating, retaining, or compensating employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present, including any reports, penalties, disciplinary actions or reprimands undertaken for failure to adhere with such practices, policies and procedures.

**REQUEST NO. 26:**

Documents relating to the termination, retirement, discipline, demotion, discharge, suspension, severance, or change in position of any director, officer or any employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present with responsibility or input in soliciting, recruiting, hiring, or retaining employees, including the terms

of any cooperation, indemnification, or severance agreement between you and each such employee.

**REQUEST NO. 27:**

All agendas, minutes, notes, or memoranda of any meeting of the Board of Directors or any committee thereof regarding your practices, policies, protocols or procedures with respect to soliciting, recruiting, hiring, terminating, retaining, or compensating employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 28:**

All business plans, analyses, reports, studies, memoranda, budgets, forecasts, slide presentations, strategic plans, SWOT analyses, or costs or profit projections referring or relating, in whole or in part, to identifying potential employees to work a JACKSON HEWITT location from December 20, 2014 through the present, or soliciting, recruiting, hiring, terminating, retaining or compensating employees, including all documents comparing the effectiveness of different recruiting techniques.

**REQUEST NO. 29:**

All documents that analyze, evaluate, or summarize market conditions with respect to employees that worked in a JACKSON HEWITT location from December 20, 2014 through the present, including documents regarding competition, market shares, competitive position, employee turnover, compensation levels, and hiring capacity.

**REQUEST NO. 30:**

All documents relating to calculating, setting, modifying, raising or lowering compensation paid to persons hired or to be hired as employees in a JACKSON HEWITT location from December 20, 2014 through the present.

**REQUEST NO. 31:**

All documents relating to any requests by any employee that worked in a JACKSON HEWITT location from December 20, 2014 through the present for transfer to or employment by another JACKSON HEWITT location whether corporate-owned location or a franchise.

**REQUEST NO. 32:**

Documents, including organization charts, sufficient to identify:

    a.   individuals who act as custodians of business records and other information for any of your JACKSON HEWITT locations, such as persons responsible for management, organization, retention, preservation, and destruction of ESI;

    b.   all internal information services or information technology departments used in connection with your HR, employment and personnel database(s); and

    c.   all individuals who are responsible for creating back-ups for archiving email messages.

**REQUEST NO. 33:**

Documents sufficient to show your ESI and other Document retention, management, preservation or destruction policies.

Exhibit C

AO 88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE: | PLACE: |
|---|---|---|
| **SERVED** | *12/16/20* | **401 MARTIN LUTHER KING DRIVE   FORT VALLEY GA 31030** |

20201201105802

| SERVED ON:   **BROOKE HOLDINGS DBA JACKSON HEWITT TAX SERVICE, C/O SURUJPAUL RAMSINGH EA, PRINCIPAL**   ACCEPTED BY:   RELATIONSHIP/TITLE: | MANNER OF SERVICE: RULE 45, FEDERAL CIVIL RULE   SERVING: **SUBPOENA TO PRODUCE, ATTACHMENT, REQUESTS** |
|---|---|
| SERVED BY   *J.W. Downs* | TITLE   **PROCESS SERVER** |

## DECLARATION OF SERVER

Description of Person Receiving Document(s):

SEX: *M*   AGE: *70+*   HEIGHT: *5' 11"*   WEIGHT: *215*   SKIN: *brown*   HAIR: *Gray*   OTHER: _____

[X] To the best of my knowledge, said person was not engaged in the U.S. Military at the time of service.
I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Certification of Service is true and correct.

_____ L.S.

SIGNATURE OF *J.W. Downs*
GUARANTEED SUBPOENA SERVICE, INC.
2009 MORRIS AVENUE
UNION, NJ 07083

EXECUTED ON:   *12/17/20*

ATTORNEY:       BRUCE D. GREENBERG, ESQ.
PLAINTIFF:        JESSICA ROBINSON, ET AL
DEFENDANT:     JACKSON HEWITT, INC., ET AL
VENUE:            DISTRICT
DOCKET:          2 19 CV 9066 SDW ESK
FEE:                0.00

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS
 (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but not limited to, lost earnings and a reasonable attorney's fee.
 (2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
 (B) Subject to paragraph (d)(2) of this rule, person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.
 (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
 (i) fails to allow reasonable time for compliance;
 (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person,

except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
 (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
 (iv) subjects a person to undue burden.

(B) If a subpoena
 (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
 (ii) requires disclosure of an unretained expert's opinion or information not describing specific events of occurrences in dispute and resulting from the expert's study made not at the request of any party, or
 (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assure that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
 (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
 (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Exhibit D



Joy Ramsingh
joy@ramsinghlegal.com
P: 615-796-3154
F: 615-616-8723

January 25, 2021

*Via email*

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973)877-3820
bgreenberg@litedepalma.com

> RE:   **REQUEST FOR EXTENSION OF TIME**
> ***Robinson, et al. v. Jackson Hewitt, Inc. et al.,***
> **2 :19-cv-9066**
> **Subpoena to Third-Party Franchisee**

Dear Sir,

Please be advised that I represent Mr. Ravindra Ramsingh of Brooke Holdings, a Jackson Hewitt franchisee owner. Mr. Ramsingh recently became aware of a subpoena issued in a class action lawsuit pending in the United States District Court in the District of New Jersey, captioned as *Robinson et. al v. Jackson Hewitt, Inc*., at 2:19-cv-9066. The subpoena was issued to Brooke Holdings d/b/a Jackson Hewitt Tax Service, 401 Martin Luther King Drive, Fort Valley, Georgia, 31030.

I was first notified of this subpoena on January 22, 2021, less than one business day ago.

My client has every intention of responding to this subpoena pursuant to the Stipulated Protective Order issued in this matter on January 4, 2021. As I'm sure you are aware, tax season (February 12, 2021 to April 15, 2021) is the busiest time of the year for third-party franchisees. I've already spoken to my client in the last 24 hours about the documents relating to this request and my client is in the process of reviewing them.

My understanding is that the current fact discovery deadline in this matter is March 1, 2021. **I'm seeking an agreed-upon extension of time to provide responsive documents to this subpoena until February 19, 2021.**

If you would like to discuss, I'm available any time at 615-796-3154, or at joy@ramsinghlegal.com.

Respectfully,

Joy Ramsingh
RAMSINGH LEGAL
116 Pine St., Ste. 402
Harrisburg, PA 17101

# Exhibit E



Joy Ramsingh
joy@ramsinghlegal.com
P: 615-796-3154
F: 615-616-8723

February 15, 2021

*Via email only*

ATHENS REPORTING
460 N. Thomas Street
Athens, GA 30601
Production-ca@veritext.com

>                 **RE:**    ***Robinson et. al v. Jackson Hewitt, Inc., et. al***
>                          **Brook Holdings d/b/a Jackson Hewitt Tax Service at**
>                          **401 Martin Luther King Drive, Fort Valley, Georgia**

To whom it may concern:

   We are in receipt of the subpoena served on Brooke Holdings d/b/a Jackson Hewitt Tax Service at 401 Martin Luther King Drive, Fort Valley, Georgia, as modified by a Stipulated Protective Order entered on January 4, 2021.

   By agreement of the parties, the production deadline was further extended until February 15, 2021. Below are my client's responses:

**Request 1:** See attached responsive documents.

**Request 2:** Not applicable. The data provided for all requests is self-explanatory and obtained mainly through JHNET (Jackson Hewitt website for managing our businesses), ADP (a popular employee payroll system) and on folders on the owner's computer.

**Request 16:** The client searched his business email account for the following key words:

1. "Sonia employee"

2. "Solicitation"

3. "Recruitment"

4. "Hiring"

5. "Hired"

Sonia Millhouse is and has been the regional director for Jackson Hewitt during the period the subpoena refers to. If the client had any communications or documents relating to this topic, it would likely be between him and her, which is why her name was included in the key term search list. See attached documents.

The client also searched his electronic and hard files for documents relating to employee solicitation, recruitment, and hiring that were exchanged between Brooke Holdings d/b/a Jackson Hewitt Tax Service at 401 Martin Luther King Drive, Fort Valley, Georgia and any other Jackson Hewitt location. He could not find any responsive documents.

**Request 17:** The client has never heard of the term "Recruiting Fee Development Agreement" or anything close to it. He interpreted this Request as seeking information relating to Section 17.3 of my Franchise Agreement, which he attached.

The client couldn't find any emails or other documents relating to this, after searching for similar keywords as in Request 16.

**Request 18:** Same response as Request 17.

**Request 19:** See attached documents.

**Request 20:** Using the same keyword search as in Request No. 16, the client had no additional documents that would be responsive to Request No 20.

**Request 30:** See attached documents.

**Request 31:** The client has no responsive documents to Request 31. To the client's knowledge, no employee of his has requested a transfer.

Respectfully,

Joy Ramsingh

# Exhibit F

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JESSICA ROBINSON, et al., individually and on behalf of others similarly situated, | Civil Action No.: 2:19-cv-9066(SDW)(LDW) |
| *Plaintiffs*, | |
| v. | |
| JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC., | [PROPOSED] DISCOVERY CONFIDENTIALITY ORDER |
| *Defendants*. | |

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1. Any party to this litigation and any third-party shall have the right to designate as "Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential personal information, or (c) that contains information received in confidence from third parties, or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure and Local Civil Rule 5.3. Any party to this litigation or any third party covered by this Order, who produces

or discloses any Confidential material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

2. Any party to this litigation and any third-party shall have the right to designate as "Attorneys' Eyes Only" and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the designating party. Any party to this litigation or any third party who is covered by this Order, who produces or discloses any Attorneys' Eyes Only material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Attorneys' Eyes Only").

3. All Confidential material shall be used by the receiving party solely for purposes of the prosecution or defense of this action, shall not be used by the receiving party for any business, commercial, competitive, personal or other

purpose, and shall not be disclosed by the receiving party to anyone other than those set forth in Paragraph 4, unless and until the restrictions herein are removed either by written agreement of counsel for the parties, or by Order of the Court. It is, however, understood that counsel for a party may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Confidential material, provided that such advice and opinions shall not reveal the content of such Confidential material except by prior written agreement of counsel for the parties, or by Order of the Court.

4. Confidential material and the contents of Confidential material may be disclosed only to the following individuals under the following conditions:

    a. Outside counsel (herein defined as any attorney at the parties' outside law firms) and relevant in-house counsel for the parties;

    b. Outside experts or consultants retained for purposes of this action, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A;

    c. Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

    d. The Court and court personnel, including any special master appointed by the court;

e.  Any witness and his or her counsel, provided that the disclosing party believes in good faith that disclosure is reasonably necessary to elicit relevant testimony from the witness. Disclosure shall be made only during the course of a deposition, hearing or trial in this action concerning the claims in this action; and counsel shall undertake all reasonable efforts not to disclose any unrelated confidential information to the witness (or their counsel) during the course of such deposition or examination. In no event shall any witness or counsel to a third-party witness retain a copy of documents marked Confidential.

f.  Any deponent may be shown or examined on any information, document or thing designated Confidential if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein, or is employed by the party who produced the information, document, or thing, or if the producing party consents to such disclosure;

g.  Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial, and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, and individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and

> clerical employees whose duties and responsibilities require access to such
> materials;
>
> h. Any mediator appointed by the court or jointly selected by the parties; and
>
> i. The parties. In the case of parties that are corporations or other business
>    entities, "party" shall mean executives who are required to participate in
>    decisions with reference to this lawsuit.

5. Confidential material shall be used only by individuals permitted access to it under Paragraph 4. Confidential material, copies thereof, and the information contained therein, shall not be disclosed in any manner to any other individual, until and unless (a) the producing party consents to the disclosure, or (b) the Court orders such disclosure.

6. With respect to any depositions that involve a disclosure of Confidential material of a party to this action, such party shall have until thirty (30) days after receipt of the deposition transcript within which to inform all other parties that portions of the transcript are to be designated Confidential, which period may be extended by written agreement of the parties. No such deposition transcript shall be disclosed to any individual other than the individuals described in Paragraph 4 above and the deponent during these thirty (30) days, and no individual attending such a deposition shall disclose the contents of the deposition to any individual other than those described in Paragraph 4 above during said thirty (30) days. Upon being

informed that certain portions of a deposition are to be designated as Confidential, all parties shall immediately cause each copy of the transcript in its custody or control to be appropriately marked and limit disclosure of that transcript in accordance with Paragraphs 3 and 4.

7. Material produced and marked as Attorneys' Eyes Only may be disclosed only to counsel for the receiving party and to such other persons as counsel for the producing party agrees in advance or as Ordered by the Court.

8. If counsel for a party receiving documents or information designated as Confidential or Attorneys' Eyes Only hereunder objects to such designation of any or all of such items, the following procedure shall apply:

a. Counsel for the objecting party shall serve on the designating party or third party a written objection to such designation, which shall describe with particularity the documents or information in question and shall state the grounds for objection. Counsel for the designating party or third party shall respond in writing to such objection within 14 days and shall state with particularity the grounds for asserting that the document or information is Confidential or Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void. If the designating party or nonparty makes a timely response to such

objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute.

b. If a dispute as to a Confidential or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall present the dispute to the Court initially by telephone or letter, in accordance with Local Civil Rule 37.1(a)(1), before filing a formal motion for an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

9. All requests to seal documents filed with the Court shall comply with Local Civil Rule 5.3.

10. If the need arises during trial or at any Hearing before the Court for any party to disclose Confidential or Attorneys' Eyes Only information, it may do so only after giving notice to the producing party and as directed by the Court.

11. To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed

or as to any other material or information concerning the same or related subject matter. Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated Confidential within a reasonable time after disclosure. Such notice shall constitute a designation of the information, document or thing as Confidential under this Discovery Confidentiality Order.

12. When the inadvertent or mistaken disclosure of any information, document or thing protected by privilege or work-product immunity is discovered by the producing party and brought to the attention of the receiving party, the receiving party's treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B). Such inadvertent or mistaken disclosure of such information, document or thing shall not by itself constitute a waiver by the producing party of any claims of privilege or work-product immunity. However, nothing herein restricts the right of the receiving party to challenge the producing party's claim of privilege if appropriate within a reasonable time after receiving notice of the inadvertent or mistaken disclosure.

13. No information that is in the public domain or which is already known by the receiving party through proper means or which is or becomes available to a party from a source other than the party asserting confidentiality, rightfully in possession of such information on a non-confidential basis, shall be deemed or considered to be

Confidential or Attorneys' Eyes Only material under this Discovery Confidentiality Order.

14. This Discovery Confidentiality Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Discovery Confidentiality Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

15. This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court or by the written stipulation of the parties filed with the Court.

16. Upon final conclusion of this litigation, each party or other individual subject to the terms hereof shall be under an obligation to assemble and to return to the originating source all originals and unmarked copies of documents and things containing Confidential material and to destroy, should such source so request, all copies of Confidential material that contain and/or constitute attorney work product as well as excerpts, summaries and digests revealing Confidential material; provided, however, that counsel may retain a complete copy of the file to the extent required by the applicable state rule(s) of professional conduct, as well as complete copies of all transcripts and pleadings including any exhibits attached thereto for archival purposes, subject to the provisions of this Discovery Confidentiality Order. After the requisite time period to retain the client file has passed, Confidential

material shall be destroyed as required herein. To the extent a party requests the return of Confidential material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom and all related proceedings, the party shall file a motion seeking such relief.

IT IS SO ORDERED.

Dated: __1/3/2020__          _Leda Dunn Wettre_
                              Leda Dunn Wettre
                              United States Magistrate Judge

Dated: January 2, 2020

*/s/ Bruce D. Greenberg*
**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 877-3820
bgreenberg@litedepalma.com

**HARTLEY LLP**
Jason S. Hartley (*pro hac vice*)
101 W. Broadway, Suite 820
San Diego, California 92101
(619) 400-5822
hartley@hartleyllp.com

**PAUL LLP**
Richard M. Paul III (*pro hac vice*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
Rick@PaulLLP.com
Laura@PaulLLP.com

**JOSEPH SAVERI LAW FIRM, INC.**
Joseph R. Saveri (*pro hac vice*)
James Dallal (*pro hac vice*)
601 California Street, Suite 1000
San Francisco, CA 94108
(415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
(pro hac vice to be submitted)
Amanda M. Williams
(pro hac vice to be submitted)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com

Respectfully submitted,

*/s/ James S. Coons*
James S. Coons
**ANSA ASSUNCAO, LLP**
100 Matawan Road, Suite 410
Matawan, New Jersey 07747
Ph: 732-993-9850
Fax: 732-993-9851
James.Coons@ansalaw.com

Scott McIntosh (*pro hac vice*)
Jonathan Labukas (*pro hac vice*)
**QUARLES & BRADY LLP**
1701 Pennsylvania Ave., NW, Suite 700
Washington, DC 20006
Ph: (202) 372-9512
Fax: (202) 372-9596
Scott.McIntosh@quarles.com
Jonathan.Labukas@quarles.com

***Attorneys for Jackson Hewitt Inc. and Tax Services of America, Inc.***

**FREED KANNER LONDON & MILLEN
LLC**
Douglas A. Millen
(pro hac vice to be submitted)
Brian Hogan
(pro hac vice to be submitted)
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com
bhogan@fklmlaw.com

**AHDOOT & WOLFSON, PC**
Tina Wolfson
(pro hac vice to be submitted)
Henry Keltson
(pro hac vice to be submitted)
1016 Palm Ave
West Hollywood, CA 90069
Tel: (310) 474-9111
twolfson@adhootwolfson.com
astraus@ahdootwolfson.com

**ATTORNEYS FOR PLAINTIFFS**

## EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSICA ROBINSON, et al., individually and on behalf of others similarly situated, | : Civil Action No.: : 2:19-cv-9066(SDW)(LDW) : |
| *Plaintiffs,* | : : |
| v. | : : |
| JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC., | : **AGREEMENT TO BE BOUND BY** : **DISCOVERY CONFIDENTIALITY** : **ORDER** |
| *Defendants.* | : : |

I,_____, being duly sworn, state that:

1. My address is _____.

2. My present employer is _____and the address of my present employment is_____.

3. My present occupation or job description is _____.

4. I have carefully read and understood the provisions of the Discovery Confidentiality Order in this case signed by the Court, and I will comply with all provisions of the Discovery Confidentiality Order.

5. I will hold in confidence and not disclose to anyone not qualified under the Discovery Confidentiality Order any Confidential Material or any words,

summaries, abstracts, or indices of Confidential Information disclosed to me.

6. I will limit use of Confidential Material disclosed to me solely for purpose of this action.

7. No later than the final conclusion of the case, I will return all Confidential Material and summaries, abstracts, and indices thereof which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party for whom I was employed or retained.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____.                    _____

                                           [Name]

Exhibit G

**Subject:**    RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings
**Date:**    Monday, April 26, 2021 at 1:51:20 PM Eastern Daylight Time
**From:**    Joy Baxter Ramsingh
**To:**    Brad King
**CC:**    Henry Kelston
**Attachments:** image001.png, image002.png

Good afternoon Brad,

The subpoena was sent to Brooke Holdings d/b/a Jackson Hewitt Tax Service, c/o Suruj Paul Ramsingh EA Principal, 401 Martin Luther King Drive, Fort Valley, GA 31030. According to the specific address and manager name included on the subpoena, we interpreted this subpoena as seeking information from the Fort Valley location, which is managed by Suruj Paul Ramsingh. The franchisee records are separately maintained, although the hiring practices are the same across all offices. That said, the Fort Valley location is the largest office Brooke Holdings owns and is considered to be their "main" or primary office in terms of employee hiring and business volume.

I'm speaking to the client today about providing the additional data fields you have requested for the Fort Valley office.

Joy

---

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Tuesday, April 20, 2021 3:30 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Hello Joy,

I hope this email finds you well. We have reviewed the subpoena production from Brooke Holdings and wanted to follow up on several issues:

1. We believe this franchisee has 28 offices, but the dataset produced ("EmploymentData") includes only 6 employees and appears to be a data sample. Please confirm.

2. Assuming this is a data sample, we seek the following modifications to make it useable:

   a. Only "Hours" are provided at an annual level. We need all fields in the dataset at the annual level. Also, please provide overtime hours.

    b.  Sample data indicates only the "beginning" and "ending" hourly wage for the duration of employment. Please request historical hourly wages (base and OT) for each year.

    c.  No information has been provided on bonuses/commissions. Please provide bonus and commissions pay.

    d.  Please clarify the coverage period for each year (calendar year, fiscal year, what months) in Hours 2014 – 2020.

Please let me know at your earliest convenience.



2600 W. Olive Avenue | Suite 500
Burbank, California 91505-4521
Tel (310) 474-9111
Fax (310) 474-8585
bking@ahdootwolfson.com

---

**From:** Brad King <bking@ahdootwolfson.com>
**Date:** Monday, March 8, 2021 at 9:46 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Thanks, Joy – I will check on that and let you know.

---

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Date:** Monday, March 8, 2021 at 5:57 PM
**To:** Brad King <bking@ahdootwolfson.com>
**Subject:** RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Brad,

Sorry for delayed response, I'm on maternity leave and am intermittently checking email.

We provided all documents electronically to the email address listed on the subpoena (Production-ca@veritext.com) on February 15, 2021.

Please let me know if we need to resend to another address.

Joy

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Monday, March 1, 2021 10:32 AM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Hi Joy,

I hope this email finds you well. I don't believe we have received any production to date. But please correct me if I'm wrong on that, as I was on leave for most of February. Either way, please provide an update no later than close of business tomorrow, March 2, 2021.

Thanks,
Brad

Bradley King
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
bking@ahdootwolfson.com
www.ahdootwolfson.com

********
The information in this electronic mail is confidential and may be privileged. If you are not the intended recipient, you are hereby notified that any review, dissemination, disclosure, copying, or distribution of the information in these documents is strictly prohibited. If you have received this communication in error, please contact the sender by reply mail and destroy all copies of the original message.

********
IRS Circular 230: under U.S. treasury regulations, we are required to inform you that any tax advice contained in this communication (including any attachment) is not intended to be used, and cannot be used, to avoid penalties imposed under the internal revenue code.

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Date:** Wednesday, January 27, 2021 at 1:36 PM
**To:** Brad King <bking@ahdootwolfson.com>
**Subject:** Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Brad,

Thanks for getting in touch with me regarding my request for an extension of time for the subpoena served on Brooke Holdings. This will confirm our agreement to an extension of the production

)21.



P: 615-796-3154
F: 615-616-8723
*The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.*

# Exhibit H

**Subject:**    RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings
**Date:**    Friday, June 4, 2021 at 9:38:43 AM Eastern Daylight Time
**From:**    Joy Baxter Ramsingh
**To:**    Brad King
**CC:**    Henry Kelston
**Attachments:** image001.png, image002.png

Good morning Brad,

I'm confused. As we discussed previously, my client provided all information sought by the subpoena addressed to, and served on, our Fort Valley franchisee employee. To my knowledge, no other franchisee owned by my client has received a subpoena.

At your request, my client reorganized his data files to present them in the format you requested, at great effort on his part during the busiest season of his fiscal year. Please let me know if you have any additional requests. We've done our best to accommodate thus far. This is the first I've heard from you since April, when you thanked me for producing and reorganizing additional data that was, in my opinion, beyond the scope of the subpoena.

Joy

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Thursday, June 3, 2021 4:54 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Joy, we would like to request a full production of the requested data. Please let us know, thanks.

**From:** Brad King <bking@ahdootwolfson.com>
**Date:** Friday, April 30, 2021 at 3:39 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Thank you very much, Joy. Have a nice weekend.

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Date:** Friday, April 30, 2021 at 3:32 PM
**To:** Brad King <bking@ahdootwolfson.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Brad,

Attached is a new Employment Data spreadsheet. Unless otherwise specified, all fields reflect the employee's status for the entire duration of employment. Historical hourly wages for each year have been broken down, bonus pay was added, and the coverage period for each year has been clarified.

Joy

---

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Tuesday, April 27, 2021 11:45 AM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Great, thank you, Joy.

---

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Sent:** Tuesday, April 27, 2021 11:42:10 AM
**To:** Brad King <bking@ahdootwolfson.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Hi Brad,

As a follow up, I spoke to the client about the formatting and information you requested below. He is working on compiling the additional information in the format you requested, and anticipates being able to provide that by the end of this week.

Joy

---

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Tuesday, April 20, 2021 3:30 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Cc:** Henry Kelston <hkelston@ahdootwolfson.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Hello Joy,

I hope this email finds you well. We have reviewed the subpoena production from Brooke Holdings and wanted to follow up on several issues:

1. We believe this franchisee has 28 offices, but the dataset produced ("EmploymentData") includes only 6 employees and appears to be a data sample. Please confirm.

2. Assuming this is a data sample, we seek the following modifications to make it useable:

   a. Only "Hours" are provided at an annual level. We need all fields in the dataset at the annual level. Also, please provide overtime hours.

b. Sample data indicates only the "beginning" and "ending" hourly wage for the duration of employment. Please request historical hourly wages (base and OT) for each year.

c. No information has been provided on bonuses/commissions. Please provide bonus and commissions pay.

d. Please clarify the coverage period for each year (calendar year, fiscal year, what months) in Hours 2014 – 2020.

Please let me know at your earliest convenience.



2600 W. Olive Avenue | Suite 500
Burbank, California 91505-4521
Tel (310) 474-9111
Fax (310) 474-8585
bking@ahdootwolfson.com

---

**From:** Brad King <bking@ahdootwolfson.com>
**Date:** Monday, March 8, 2021 at 9:46 PM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Thanks, Joy – I will check on that and let you know.

---

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Date:** Monday, March 8, 2021 at 5:57 PM
**To:** Brad King <bking@ahdootwolfson.com>
**Subject:** RE: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Brad,

Sorry for delayed response, I'm on maternity leave and am intermittently checking email.

We provided all documents electronically to the email address listed on the subpoena (Production-ca@veritext.com) on February 15, 2021.

Please let me know if we need to resend to another address.

Joy

---

**From:** Brad King <bking@ahdootwolfson.com>
**Sent:** Monday, March 1, 2021 10:32 AM
**To:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Subject:** Re: Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Hi Joy,

I hope this email finds you well. I don't believe we have received any production to date. But please correct me if I'm wrong on that, as I was on leave for most of February. Either way, please provide an update no later than close of business tomorrow, March 2, 2021.

Thanks,
Brad

Bradley King
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
bking@ahdootwolfson.com
www.ahdootwolfson.com

********
The information in this electronic mail is confidential and may be privileged. If you are not the intended recipient, you are hereby notified that any review, dissemination, disclosure, copying, or distribution of the information in these documents is strictly prohibited. If you have received this communication in error, please contact the sender by reply mail and destroy all copies of the original message.
********
IRS Circular 230: under U.S. treasury regulations, we are required to inform you that any tax advice contained in this communication (including any attachment) is not intended to be used, and cannot be used, to avoid penalties imposed under the internal revenue code.

**From:** Joy Baxter Ramsingh <joy@ramsinghlegal.com>
**Date:** Wednesday, January 27, 2021 at 1:36 PM
**To:** Brad King <bking@ahdootwolfson.com>
**Subject:** Robinson v. Jackson Hewitt, Third Party Subpoena, Brooke Holdings

Brad,

Thanks for getting in touch with me regarding my request for an extension of time for the subpoena served on Brooke Holdings. This will confirm our agreement to an extension of the production

his will confirm our agreement to an extension of the production
)21.



P: 615-796-3154
F: 615-616-8723

*The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its*